IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cr. No. <u>04-20386 DP</u> |
| ) | |
| CHRIS ANTHONY PARKS, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Before the court, through counsel, is defendant Chris Anthony Parks's motion to determine that defendant is not competent to stand trial, pursuant to 18 U.S.C. § 4241. The matter was referred to the United States Magistrate Judge for a report and recommendation. A competency hearing was held on April 1, 2005. All parties were present and heard. Prior to the hearing, Parks filed a Memorandum in Support of Motion to Determine Chris Parks's Competency to Stand Trial, as well as several hundred pages of mental health records for the defendant.

For the reasons below, it is recommended that Parks be declared competent to stand trial.

### I. PROPOSED FINDINGS OF FACT

A.  Procedural History

On June 2, 2004, Parks was arrested and charged via a criminal

complaint with committing arson at the Millington Post Office, in violation of 18 U.S.C. § 81.  The complaint alleges that Parks poured gasoline into the drop boxes at the post office, set fire to some papers with a lighter, and threw the burning papers into the drop boxes – causing approximately $20,000 worth of damage and destroying approximately 500 pieces of mail.  Parks was brought before the United States Magistrate Judge for his initial appearance that same day, and following a preliminary hearing and bond hearing, was ordered detained.

On June 10, 2004, the government filed an unopposed motion requesting that Parks undergo a mental evaluation to determine if he is competent to stand trial, pursuant to 18 U.S.C. § 4241, and whether he was sane at the time of the offense, pursuant to 18 U.S.C. § 4242.  The court granted that motion by order entered on June 14, 2004.[1]

Pursuant to the court's June 14 order, Parks was transported to the Federal Medical Center in Lexington, Kentucky ("FMC-Lexington").  There he was observed, examined, and evaluated by Forensic Psychologist Karen Milliner, Psy.D.  She completed her evaluation on November 10 and concluded that Parks (1) is competent to stand trial and (2) was sane at the time of the offense.[2]

---

[1] On September 16, 2004, a federal grand jury indicted Parks on charges of setting fire to the post office building and destroying a letter box.

[2] By order dated September 24, 2004, the court granted a request from the Bureau of Prisons for an extension of time to

During December 2004 and January 2005, the parties appeared before the court on multiple occasions to address Parks's competency. At these proceedings, counsel for Parks challenged the reliability of Dr. Milliner's findings and conclusions, and asked that the court order Parks to be evaluated once again, but this time by a forensic *psychiatrist*. The court denied the request at that time, but informed the parties that the court would conduct a competency hearing as requested by defense counsel, and at that hearing the court would reconsider defendant's request for another evaluation.

The competency hearing was held on April 1, 2005. Prior to the hearing, defense counsel filed a supporting memorandum. In the memorandum, counsel highlighted Parks's extensive mental health history, and again requested that the court order another competency evaluation by a forensic psychiatrist. Defense counsel attached several hundred pages of documents comprising of some (but not all) of Parks's mental health records, some dating as far back as March 1980.

At the hearing, the government relied on the forensic report completed by Dr. Milliner, as well as three other forensic reports prepared as part of competency proceedings in a prior criminal arson case brought against Parks, United States v. Chris Parks, 01 CR 20050 (complaint filed Feb. 22, 2001 W.D. Tenn.)(Mays, J.).

---

complete Parks's evaluation.

3

These reports were made exhibits to the hearing. Defense counsel called Dr. Kevin Turner, M.D., and Nancy Carey to testify. Dr. Turner, a Board certified psychiatrist employed by the State of Tennessee and Correction Corporations of America, testified about his interactions with Parks while Parks was confined at the West Tennessee Detention Center ("WTDC") in Mason, Tennessee. Carey is the Health Services Administrator at the WTDC and testified regarding Parks's use of (and refusal to use) medication while in federal custody on the current charges. In addition, defense counsel described to the court the problems he has encountered during his interaction with Parks. Counsel argued that his difficulty in communicating with Parks and the medical records attached to the motion demonstrate that a forensic psychiatrist needs to conduct another evaluation of Parks. Alternatively, counsel submits that the court should find that Parks is incompetent and order that he be sent to a Federal Medical Center in order to be restored to competency.

**B.    Forensic Reports and Mental Health Records**

   1.   Dr. Milliner's Report

Dr. Milliner observed and examined Parks during the Fall of 2004, and prepared a forensic report as directed by the court. In addition to examining Parks, Dr. Milliner conducted a comprehensive review of Park's investigation and court documents, mental health records, prior forensic reports, and interviewed investigators, probation and pretrial services officers, and Parks's grandmother.

4

Dr. Milliner administered the Wechsler Adult Intelligence Scale test, Third Edition, and the Minnesota Multiphasic Personality Inventory test, Second Edition. Ultimately, Dr. Milliner diagnosed Parks with Antisocial Personality Disorder, Borderline Personality Disorder ("BPD"), a history of Schizoaffective Disorder, and polysubstance dependence.

Dr. Milliner states in her report that "[a] personality disorder is not considered a severe mental illness, but a long standing pattern of perceiving oneself and one's environment, interpreting one's experiences, and relating to others which significantly interferes with one's social and occupational functioning." Antisocial Personality Disorder is distinguished by "a pervasive disregard of social norms, often manifesting in dishonesty, irresponsibility, irritability, aggressiveness, recklessness, and a lifestyle of criminal activity." BPD "is characterized by a pervasive pattern of emotional, interpersonal, and behavioral instability. This instability often manifests in emotionally labile, immature, impulsive, and self-destructive behavior."

The report emphasizes that Parks's behavioral problems arise from interpersonal conflict and interaction, as opposed to a mood disorder. Apparently, Parks attempted to manipulate his circumstances at FMC-Lexington through dramatic displays of shifting emotional states. He generally refused the prescribed psychotropic medication, and Dr. Milliner states that "[w]hen Mr.

5

Parks took the medication, it was not clear the medication effected any significant change in his conduct." She also claims that "because Mr. Parks' aggression appears related to personality disorders, rather than resulting from a thought or mood disorder, medication should not be expected to eliminate his aggression."

Dr. Milliner opines that Parks "should be considered a high risk for acting out dangerously toward himself and others." Specifically, Parks is reported to have stated,

> I have a lot of rage in me . . . . There's been times I've thought about walking into a federal building and start shooting, or walk into a police station and start shooting until they take me out. Sooner or later I'm probably going to get so tired of life and want to make a statement, and take some people with me before I go.

Dr. Milliner concludes that Parks is competent to stand trial and was not legally insane when he set fire to the Millington post office. In conversations with Dr. Milliner, Parks demonstrated a good understanding of the criminal proceedings against him and the individuals involved. She states that he understood the adversarial nature of the legal system and the role of his attorney. Parks indicated difficulty in working productively with his attorney, but Dr. Milliner suggests this is consistent with interpersonal interactions Parks has with others. Dr. Milliner also states that "Parks articulated detailed accounts of the circumstances surrounding his arrest, and the acts leading to and constituting the alleged offense, and indicated he would be able to provide this same information to his attorney."

6

Dr. Milliner reports that Parks accurately defined the role of the prosecutor, as well as an understanding of what it meant to plead guilty, what it meant to plead not guilty, plea bargains, and the potential consequences of a conviction. Additionally, Parks reported understanding the illegality of his act and indicated his desire to return to an institution. Dr. Milliner maintains that "[t]hough his unusual feelings may not reflect motivation to obtain what is typically viewed as a favorable outcome to the pending proceedings, his statements were not related to any confusion, perceptual distortion, or delusions, and cannot be attributed to a severe mental illness."

2.   Previous Forensic Reports

On February 23, 2001, Parks was arrested for initiating a fire in the Covington Post Office that caused $20,000 worth of damage to the facility. On March 6, 2001, the Magistrate Judge granted Parks's motion for a psychiatric examination. Parks was sent to the Federal Medical Center in Butner, North Carolina ("FMC-Butner") to undergo a psychiatric evaluation. After observing Parks for six weeks, Dr. Robert Lucking, M.D., the staff psychiatrist at FMC-Butner, prepared a forensic report on May 17, 2001.

At FMC-Butner, the staff increased Park's dosage and number of medications, and the report states that this caused him to show significant improvement and eventual resolution of his psychotic and affective symptoms. It also states that "[w]ith the increase in his psychotropic medication, Mr. Parks's symptoms decreased to

7

a level at which he was considered stable enough and he felt safe enough to be released to the open housing unit." One week after being released to the open housing unit, Parks had to return to the Seclusion Unit due to the re-emergence of suicidal thoughts. Ultimately, Dr. Lucking diagnosed Parks with a Schizoaffective Disorder, BPD, Borderline Intellectual Functioning, and Cocaine, Cannabis, and Alcohol abuse.

Dr. Lucking found Parks competent to stand trial. He stated that Parks had an adequate understanding of the charges against him, the pleas available to him, and the roles of the attorneys. The report indicates that Parks would have difficulty understanding complex legal concepts, and an attorney would need to clarify issues for him. Nevertheless, Dr. Lucking believed Parks had the ability to adequately assist his counsel at trial.

Shortly after this report was completed, defense counsel moved for a second psychiatric evaluation, arguing that the first evaluation was "ambiguous in its analysis thereby rendering its final opinion very questionable to a layman." It also claimed that the report was contradictory in that the doctor increased Park's medication to a point where his psychotic symptoms diminished, but also found that Parks had been without any medication for two weeks prior to the alleged offense, which is an adequate period of time for his psychotic and affective symptoms to return.

District Judge Julia Gibbons granted the motion for a second evaluation, citing three reasons. First, defense counsel reported

8

an inability to communicate effectively with the defendant. Second, Parks's condition apparently deteriorated since the first evaluation. Finally, "a review of the initial evaluation reveals that defendant indeed has serious mental health problems, despite the report's ultimate conclusion." The second evaluation was to be completed at the Federal Medical Center in Springfield, Missouri.

Parks was evaluated a second time from June 28 to August 10, 2001, and the second report was completed on October 12, 2001 by Karin D. Towers, J.D., Ph.D., a Postdoctoral Fellow. Dr. Towers diagnosed Parks with BPD, substance abuse, and a mood disorder, not otherwise specified, with psychotic features. Dr. Towers also opined that Parks "manifests a mental illness best described as a schizoaffective disorder," but that illness did not prevent Parks from understanding the nature and consequences of the criminal proceedings.

Dr. Towers indicated that Parks understood the current charges against him, as well as the consequences of a conviction. He understood the roles of the courtroom personnel and the various pleas available to him. In her opinion, Parks was competent to stand trial.

The second report indicated that Parks remained competent provided he continued to take his medications. After being sent to another institution, however, the new detention facility informed the court that Parks was refusing to take his medication. In January 2002, upon oral motion by the parties, Judge Gibbons

9

ordered Parks to be sent back to FMC-Springfield. The order permitted the staff at FMC-Springfield to forcibly medicate Parks if the staff deemed it appropriate. Parks was to stay there up to sixty days, until he attained "the capacity to permit the trial to proceed absent forcible medication." The order also required the director of FMC-Springfield to certify whether the defendant was suffering from a mental disease or defect if Parks's mental condition did not improve.

Parks was held at FMC-Springfield from February 1 to April 1, 2002. At the conclusion of the sixty day period, Dr. Richard Frederick, Ph.D., a clinical psychologist, submitted a report to the court. Dr. Frederick indicated that Parks's behavior is consistent with BPD, but he disagreed with Dr. Towers's diagnostic formulation that Parks suffered from a mood disorder. In his opinion, a diagnosis of BPD was sufficient to explain Park's entire presentation.

Unlike previous reports, Dr. Frederick stated that "[w]e have not seen any evidence that taking or not taking the medication has any immediate impact on [Parks's] emotional state. Instead, periods of emotional agitation appear directly related to interpersonal conflict." He concluded that Parks "clearly does not require medication to manage his behavior. We have no basis to consider him in need of involuntary medication in order for him to be competent to proceed." The institution did not forcibly medicate Parks. Nevertheless, Dr. Frederick indicated that Parks

could benefit from his medication, and regardless of whether he took the medication, it was likely that Parks would engage in future episodes of destructive behavior. Dr. Frederick opined that the court could treat any destructive behavior as voluntary behavior from "an individual with no significant impairment in intellectual capacity."

On June 27, 2002, the parties appeared before District Judge Samuel H. Mays for a competency hearing. At the conclusion of the hearing, Judge Mays found that was Parks competent to stand trial.

### 3. Mental Health Records

As stated earlier, defense counsel filed with the court several hundred pages of mental health records documenting Parks's medical, psychological, and institutional history. The documents include, among other things, psychological evaluations for public schools, evaluations to determine disability eligibility, prison investigation reports, psychological assessments for juvenile court proceedings, medical treatment plans, and hospital records. They cover a period of twenty two years from March 1980 (when Parks was six years old) to January 2001.

The records show that Parks is a slow learner and may have a learning disability. In terms of intelligence, Parks falls within the borderline to low end range of intelligence. Several records diagnose Parks with Antisocial Personality Disorder, BPS, Borderline Intellectual Functioning, and polysubstance abuse. Other diagnoses included Bipolar Disorder and Major Depressive

11

Disorder. Many records demonstrate that Parks behaves as he pleases and has limited impulse control. He displays attention seeking behavior, is immature and unsophisticated, and has poor interpersonal and social skills. The records indicate Park's mood varied greatly on different days: some days he seemed suicidal, while other days he seemed happy.

Most evaluators cite issues within the family as the origins of Parks's psychological problems. After the divorce of his parents, Parks lived with his mother, who was a woman of limited intelligence and had difficulty controlling Parks. Apparently, Parks resents his father for leaving the home. He also alleges that his older brother sexually abused him for many years. Based on this background, Parks has low self-esteem, and his behavior can also be attributed to failing to learn social norms.

### 4. Testimony of Dr. Kevin Turner and Nancy Carey

At the competency hearing, defense counsel called Kevin Turner, M.D., to testify. Dr. Turner met with Parks on fifteen to twenty occasions while Parks was confined at the WTDC. Dr. Turner diagnosed Parks with a mood disorder characterized by depression and anxiety. Additionally, Dr. Turner maintained that Parks has psychotic features highlighted by paranoia that "everyone is out to get him." Although Dr. Turner did not preform specific intelligence tests, he opined that Parks may be mildly mentally retarded. Dr. Turner also indicated that Parks's behavior could be improved by taking medication, and would best be suited in an

12

institution that would force Parks to take his medication. Dr. Turner testified that "under his understanding of competency," Parks is competent to stand trial. He indicated that Parks would be able to discuss the case with an attorney who could explain the rules, and that Parks knows right from wrong.

Nancy Carey is the Health Services Administrator at the WTDC and testified that Parks was not taking his prescribed medications on a regular basis and that the detention center was not forcing him to take his medicine.

## II. PROPOSED CONCLUSIONS OF LAW

A criminal defendant may not be tried unless he is competent. See Godinez v. Moran, 509 U.S. 389, 396 (1993). An accused is competent to stand trial unless he is "suffering from a mental disease or defect rendering him . . . unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). For a defendant to be considered competent to stand trial, the defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam). A defendant who is mentally ill may still be competent to stand trial. United States v. Davis, 93 F.3d 1286, 1290 (6th Cir. 1996). While past psychiatric problems are relevant, "[t]he question of competency to stand trial is limited to the defendant's

13

abilities at the time of trial." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986).

Under 18 U.S.C. § 4241(d), the hearing court must find "by a preponderance of the evidence" that the defendant is not competent to stand trial. The burden to prove a lack of competence is on the defendant. See Cooper v. Oklahoma, 517 U.S. 348 (1996) (commenting that under section 4241, "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence").

Although medical records spanning a period of over two decades demonstrate that Parks has had a long history of serious mental illnesses, for purposes of determining his present competency to stand trial in this case, the court relies primarily on the evaluation conducted by Dr. Milliner.[3] In that report, Dr. Milliner described Parks's ability to understand the proceedings against him and the importance of communicating with his attorney. In their discussions, Parks articulated the circumstances surrounding his arrest and indicated that he could provide that information to his attorney. Parks also accurately described the criminal legal process, as well as the role of various courtroom personnel and the pleas available to him.

Dr. Milliner's conclusions are consistent with the other

---

[3] As discussed above, the mental health records submitted by defense counsel are not inconsistent with Dr. Milliner's report. Both Dr. Milliner's report and the medical records demonstrate that Parks has had a long history of mental illness.

14

forensic reports prepared as part of Parks's prior federal criminal case, Judge Mays's finding that Parks was competent in that prior case, and Parks's mental health records. The forensic reports prepared by Dr. Lucking at FMC-Butner and Dr. Towers at FMC-Springfield indicate similar conversations regarding Parks's understanding of criminal proceedings to those more recently experienced by Dr. Milliner when she spoke with Parks. Finally, Dr. Turner testified that he could effectively communicate with Parks with some effort by the doctor, even when Parks was not on his medication.[4]

### III. CONCLUSION

For the above reasons, it is recommended that defendant be found competent to stand trial. Further, it is recommended that defense counsel's request to order a competency evaluation conducted by a forensic psychiatrist be denied.

Respectfully submitted,

_[signature]_
TU M. PHAM
United States Magistrate Judge

Date 4/25/05

---

[4] During the hearing, defense counsel indicated that he was not currently asking the court to order that Parks be forcibly medicated, but he did suggest that he might consider making such a request at some later date.

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 42 in case 2:04-CR-20386 was distributed by fax, mail, or direct printing on April 26, 2005 to the parties listed.

---

J. Patten Brown
FEDERAL PUBLIC DEFENDER
200 Jefferson Ave.
Ste. 200
Memphis, TN 38103

Stephen B. Shankman
FEDERAL PUBLIC DEFENDER
200 Jefferson Ave.
Ste. 200
Memphis, TN 38103

Tracy Lynn Berry
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable Bernice Donald
US DISTRICT COURT